**IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF PENNSYLVANIA**

DEKAEDA DAVIS,

               Plaintiff,

      v.

CUMBERLAND VALLEY SCHOOL
DISTRICT, MICHAEL CRAIG,
HAROLD "BUD" SHAFFNER,
GREGORY RAUSCH, KRISTI
SHAFFNER, AND BETHANY MULLIN

               Defendants.

Civil Action No. 1:25-cv-01162-JPW

<u>**JURY TRIAL DEMANDED**</u>

<u>**FIRST AMENDED COMPLAINT IN CIVIL ACTION**</u>

AND NOW come Plaintiff, Dekaeda Davis, by and through her undersigned attorneys, George R. Farneth II, Esquire and The Farneth Law Group, LLC, and Nicholas A. Miller, Esquire and Brenlove & Fuller, LLC, and file this First Amended Complaint in Civil Action, averring as follows:

<u>**THE PLAINTIFF PARTIES**</u>

1. Plaintiff, Dekaeda Davis ("Ms. Davis") is an eighteen-year-old student who resides within the boundaries of Defendant, Cumberland Valley School District ("CVSD"), and because of the facts averred herein, she attends Cumberland Valley High School ("CVHS") by way of virtual instruction.

2. Ms. Davis resides in the Middle District of Pennsylvania with her parents Kaesie Davis (Mrs. Davis) and Derek Davis (Mr. Davis), who are husband and wife.

3. Ms. Davis is a protected class under Title IX of the Education Amendments Act of 1972. 20 U.S.C. § 1681(a).

4. Ms. Davis is a protected class for the Purposes of Equal Protection Claims under the Fourteenth Amendment.

**THE DEFENDANT PARTIES**

5. CVSD is the local educational agency responsible for the administration and operation of a large, rural, and suburban public school district located in Central Pennsylvania with a primary address of 6746 Carlisle Pike, Mechanicsburg, PA 17050 and is a little under 9 miles "as the crow flies" from the Pennsylvania State Capitol Building and Pennsylvania Governor's Mansion.

6. CVSD educates more than 10,200 students across 13 schools in Hampden Township, Monroe Township, Middlesex Township, and Silver Spring Township in Cumberland County, Pennsylvania.

7. CVSD is a political subdivision of the Commonwealth of Pennsylvania and therefore has the power to act under the authority of state law.

8. CVHS is the only high school in CVSD and is located at 6746 Carlisle Pike, Mechanicsburg, PA 17050.

9. CVHS consists of grades 9 through 12.

10. Per a study done by U.S. News and World Report, in accordance with its stated ranking factors, CVHS ranks as No. 2,282 nationally, No. 81 among Pennsylvania schools, and No. 4 in the Harrisburg, PA Metropolitan area.

11. The CVSD School Board (the "Board") is the governing body of CVHS and is currently comprised of the following:

    a. Defendant, Greg Rausch, President ("Mr. Rausch");

    b. Michelle Nestor, Vice President;

    c. Jevon Ford, Assistant Board Secretary;

  d. Atreia Sindri;

  e. Matthew G. Barrick;

  f. Andrew Clancy;

  g. Mike Gossert;

  h. Kelly Potteiger; and

  i. Defendant, Harold "Bud" Shaffner ("Mr. Shaffner").

12. The Board is responsible for the supervision, direction, and control of the staff and students at CVHS and for adhering to federal and state laws and regulations and making and enforcing CVSD policies and procedures, whether written or unwritten, including immediately addressing and eliminating any bullying, harassment, and discrimination.

13. Defendant, Michael Craig ("Mr. Craig") is an adult resident of the Commonwealth of Pennsylvania, who resides in the Middle District of Pennsylvania.

14. At all times pertinent hereto, Mr. Craig has been employed by CVSD as CVHS's Athletic Director.

15. In his position as Athletic Director, Mr. Craig is responsible for the supervision and training of CVHS's athletic coaches and ensuring the health, safety, and well-being of CVHS's student athletes, including immediately addressing and eliminating any bullying, harassment, and discrimination.

16. Mr. Rausch is an adult resident of the Commonwealth of Pennsylvania who resides in the Middle District of Pennsylvania.

17. In his position as President of the Board, Mr. Rausch is responsible for the supervision, direction, and control of the staff and students at CVHS and for adhering to federal and state laws and regulation and making and enforcing CVSD policies and procedures, whether

written or unwritten, including immediately addressing and eliminating any bullying, harassment and discrimination.

18. Mr. Shaffner is an adult resident of the Commonwealth of Pennsylvania who resides in the Middle District of Pennsylvania.

19. At all times pertinent hereto, Mr. Shaffner has been and continues to be in *de facto* control of the Board.

20. In his position as a member of the Board, Mr. Shaffner is responsible for the supervision, direction, and control of the staff and students at CVHS and for adhering to federal and state laws and regulations and making and enforcing CVSD policies and procedures, whether written or unwritten, including immediately addressing and eliminating any bullying, harassment, and discrimination.

21. Mr. Shaffner is the husband of Defendant, Kristi Shaffner ("Mrs. Shaffner") and the father of Defendant, Bethany Mullin ("Ms. Mullin") who are both adult residents of the Commonwealth of Pennsylvania who reside in the Middle District of Pennsylvania.

22. At all times pertinent hereto, Mrs. Shaffner was employed by and/or otherwise associated with and paid by CVSD to serve as head cheerleading coach of the CVHS cheerleading/competitive spirit team.

23. Mrs. Shaffner is the mother of Ms. Mullin.

24. At all times pertinent hereto, Ms. Mullin was employed by and/or otherwise associated with and paid by CVSD to serve as a choreographer and coach of CVHS's cheerleading/competitive spirit team.

## JURISDICTION AND VENUE

25. Because a substantial part of this action arises under the law of the United States and involves one or more federal questions, this Court has jurisdiction pursuant to 28 U.S.C. § 1331.

26. Venue is proper in the Court pursuant to the provisions of 28 U.S.C. § 1391 in that all the claims set forth herein arose in the Middle District of Pennsylvania and Defendants reside and/or maintain their principal places of business in the Middle District of Pennsylvania.

## BACKGROUND FACTS

### *CVSD HAS A PERVASIVE CLIMATE OF BULLYING, HARASSMENT, DISCRIMINATION AND CONSISTENTLY MAINTAINS A HOSTILE ENVIRONMENT TOWARDS ANY MEMBER OF A PROTECTED CLASS UNDER FEDERAL LAW*

27. CVSD's website contains its alleged policy against discrimination, stating that:

> "Cumberland Valley Schools District prohibits discrimination, including sexual harassment, on the basis of race, color, age, creed, religion, sex, sexual orientation, ancestry, national origin, marital status, parenting status, pregnancy or handicap/disability in its activities, programs, or employment practices."

28. CVSD's Policy Manual Section 249 contains its alleged stance on student bullying, stating that:

> "The Board is committed to providing a safe, positive learning environment for District students. The Board recognizes that bullying creates an atmosphere of fear and intimidation, detracts from the safe environment for student learning, and may lead to more serious violence. Therefore, the Board prohibits bullying by district students."

29. For the reasons set forth herein, those policies are merely lip service, as the worst transgressors of CVSD's policies are the ones who should be policing and enforcing them, i.e.: the Board, CVSD's administration, CVSD's faculty, staff, and coaches.

30. CVSD has a long history of deliberate indifference to and/or actively condoning discrimination, bigotry, bullying and harassing behaviors, and general intolerance towards any member of a protective class that have gone unchecked and currently run rampant within the hallways, classrooms, and extra-curricular programs of its educational system.

31. One thing is perfectly clear, the toxic rot of discrimination, bigotry, bullying, and harassing behaviors, and general intolerance towards any member of a protected class in CVSD starts with Mr. Shaffner and flows throughout CVSD.

32. Mr. Shaffner not only holds such beliefs but makes sure that CVSD is molded in their image through community favors, backroom politics, retaliatory action, bullying, and general thuggery.

33. In fact, Mr. Shaffner has had *de facto* control over the Board and CVSD for decades, and his control has been absolute.

34. Plaintiffs believe that the other members of the Board, as well as CVSD's employees and personnel are forced to yield to Mr. Shaffner's individual whims, or they are ostracized and/or pushed out.

35. During his decades on the Board, Mr. Shaffner has ensured that CVSD not only adheres to his discriminatory ideals, but that his position on the Board significantly benefitted him and his family financially.

36. Mr. Rausch not only goes along with Mr. Shaffner's discriminatory agenda in violation of his duties on the Board but ensures that agenda will be followed through appointing Mr. Shaffner to favorable Board committee appointments, which also ensured his family's involvement with CVSD cheerleading.

37. The collective incidents of discrimination, bullying, and harassment toward anyone who is a member of a protective class has created a hostile, pro-bullying, and intolerant

environment which is systemic throughout the Board, CVSD's educators, CVSD's administration and personnel, CVSD's coaches, CVSD's students, and many of CVSD's parents and alumni.

38.     In an interview he gave in October 2019, Dr. David E. Christopher, who was the Superintendent of CVSD at the time, acknowledged that:

     a.     There was racial division and intolerance in the CVSD;

     b.     He vowed to rid the CVSD of that racial division and intolerance;

     c.     Ridding the CVSD of that racial division and intolerance required a collaboration with faculty, parents, and most importantly, students;

     d.     Even though he had only been on the job for less than two months, he had dealt with an outcry from parents and students over troubling reports that students of color were being targeted with racial slurs, hostility and harassment by white classmates;

     e.     Although CVSD had a zero-tolerance policy, the problem is we can say zero tolerance but then what do we do when it happens?;

     f.     We have to ensure that we have an educational component with any disciplinary action that happens in the high school;

     g.     In recent weeks, CVSD had come under scrutiny as several parents had addressed the school board with concerns that their children were being racially harassed by white students, and the district had failed to adequately address or discipline offenders;

     h.     We have significant work to do in terms of student training and faculty training, but it really is more about awareness training;

     i.     While the CVSD has had a historic belief that its discriminatory history and practices were not been as big of a deal as has been made out, that outlook no longer works; and

     j.     For the individual being harassed it is the biggest deal.

39.     CVSD had a duty to develop and implement any programs that were designed to create a collaboration between faculty, parents, and students to combat and eradicate bullying, division, discrimination, and intolerance, to develop and implement necessary and appropriate educational and training programs, and to administer necessary and appropriate disciplinary for offenders that were consistent with Dr. Christopher's admissions and suggestions.

40. Plaintiffs believe that CVSD failed to develop and implement any programs that were designed to create a collaboration between faculty, parents, and students to combat and eradicate bullying, division, discrimination and intolerance, failed to develop and implement necessary and appropriate educational and training programs, and failed to administer necessary and appropriate disciplinary policies for offenders that were consistent with Dr. Christopher's admissions and suggestions.

41. Following an audit his office conducted of the CVSD, in June 2020 Auditor General, Eugene DePasquale announced that:

a. Pennsylvania's anti-bullying law should be strengthened to ensure that school districts are reporting all instances of bullying;

b. Bullying is very harmful to students and can have lifelong implications;

c. The audit found that CVSD had reported only two instances of bullying in the past five school years; and

d. It's difficult – if not impossible – to make conclusions about the pervasiveness of bulling if school districts are underreporting it, as appears to be the case.

42. Following Mr. DePasquale's announcement, CVSD failed to develop and implement any programs that were designed to create a collaboration between faculty, parents, and students to combat and eradicate bullying, division, discrimination and intolerance, failed to develop and implement necessary and appropriate educational and training programs, and failed to administer necessary and appropriate disciplinary policies for offenders that were consistent with Dr. Christopher's admissions and suggestions.

43. The acknowledgements and announcements by Dr. Christropher and Mr. DePasquale clearly establish that bullying, discrimination, and intolerance toward members of a protected class have been and continue to be prevalent at CVSD and CVSD has a history of failing to these instances.

44. Plaintiffs also believe that in the years since the acknowledgements and announcements by Dr. Christropher and Mr. DePasquale, CVSD has still failed to appropriately address, and attempt to eradicate, bullying, discrimination, and intolerance toward members of a protected class in CVSD, even though they have a real and actual duty to do so.

45. Historical examples of such discrimination, bullying, and harassment include, but are not limited to:

a. As determined by the United States Third Circuit Court of Appeals, in 2014 CVSD violated the rights of a 10th Grade student with Crohn's disease by expelling him instead of properly evaluating, identifying, and providing accommodations for his disability;

b. In the summer of 2016, Mr. Shaffner, in furtherance of his own interests in gaining favors, forced the Board to allow Donald J. Trump to host a rally at CVHS. This was improper for a number of reasons, being that:

i. President. Trump, even at that time, had a long history of mocking and name-calling his political opponents, decades of allegations of sexual assault and harassment against numerous women, and making racially disparaging, anti-immigrant, misogynistic, and otherwise bullying and harassing comments,[1] and it should be noted that:

ii. If any CVSD student had spoken the same way that Mr. Trump did while he was at CVHS, that student would have been in violation of CVSD's policies against bullying and discrimination and punished; and

iii. It let the CVSD students, faculty, staff, parents, coaches, and community know that CVSD condoned such behaviors and that CVHS was open for business for the bullying, harassment, and discrimination of its students.

c. In 2019, multiple sources claimed that a CVHS varsity football coach yelled a racial slur at a student while playing Harrisburg High School, which is the only school CVHS's varsity football team plays where the enrollment is predominantly African American.

d. In September of 2019, the then CVSD Superintendent, Dr. Christopher, acknowledged that bullying, discrimination, and intolerance toward members of a protected class were an issue in CVSD schools and promised improvements.

---

[1] Note, that the inclusion of this example is apolitical. It is not meant to infer any allegations upon any political party or political belief but is simply looking at Mr. Trump's past statements, as well as accusations against him.

e.      In October of 2019, Dr. Christopher again openly acknowledged that bullying, discrimination, and intolerance toward members of a protected class was prevalent within CVSD amid troubling reports that students were being targeted with racial slurs, hostility, and harassment by classmates saying, "[w]e have to get kids to decide that this isn't ok," and saying that "I do think that we have significant work to do in terms of student training and faculty training," in relations racial hostility and bullying awareness training.

f.      On December 7, 2023, a teacher at CVSD's Mountain View Middle School used a flat iron to straighten the hair of an interracial minor, both in front of his class and against his will, while another teacher took pictures with her personal cell phone. Afterwards he was openly laughed at and mocked by both teachers and students due to the physical and emotional battery he endured at the hands of his educators.

g.      Maulik Pancholy, who is an openly gay actor and author, was scheduled to give a presentation on diversity, inclusion, and anti-bullying to the students at Mountain View Middle School on May 22, 2023. However, Mr. Shaffner had the Board cancel Mr. Pancholy's presentation via a motion Mr. Shaffner brought from the floor during an April 17, 2024 Board meeting, and which Mr. Rausch fully supported.[2] Mr. Shaffner made no attempt to hide why he did not want Mr. Pancholy to speak, stating that it was because Mr. Pancholy was proud of being gay and that Shaffner did not "think that should be imposed upon our students – at any age."

h.      In October 2024, a 5th grade student at Green Ridge Elementary School, who is Hispanic, was made to kneel on the ground in front of his classmates because he unintentionally dozed off in class due to suffering from a known medical condition. Not only was he forced to kneel until the pain in his knees became unbearable, but none of the white students in his class had ever been subjected to corporal punishment, which is illegal, for similar or worse behavior.

i.      Additionally in October 2024, two minor girls tried to take their own lives as a result of the intense and prolonged bullying they had endured from their peers to which the CVSD faculty and staff willfully turned a blind eye. One of those instances was the result of racial intimidation, harassment, and bullying of a girl who is mixed-race.

j.      At a June 17, 2024 Board meeting, CVSD Superintendent, Dr. Mark Blanchard, actively spoke out against Pennsylvania's attempts to create an educational funding bill that would ensure equal opportunity to education for minority and economically disadvantaged students in accordance with the Pennsylvania Commonwealth Court's ruling in *William Penn Sch. Dist. v. Pa. Dep't of Educ.*, 587 M.D. 2014 (Pa. Cmmw. Ct. Apr. 17, 2023).

k.      From 2023 to 2024, the only African American on the CVHS cheerleading team was subjected to bullying, hazing, and racial discrimination, including, but not limited to:

_____

[2] The vote from the floor was anything but spontaneous as Mr. Shaffner had orchestrated it from a secret meeting of the Board that was held in violation of the Pennsylvania's Sunshine Act.

i. Being made to wait until all the white cheerleaders were on the bus and seated to be allowed to board the bus at football games;

ii. Having awards taken away from her and not given back while white cheerleaders either did not have rewards taken away or had their awards given back under similar circumstances;

iii. Being the only cheerleader that was taken into a hotel room while on a trip to Florida for a cheerleading trip and hazed for approximately two hours, and which included being made to pretend to be walked around at a white cheerleader's pet, and

l.      A current African American senior in high school was compared to a monkey by his middle school math teacher and has regularly been stereotyped and profiled as an "angry black youth," for being upset about the discriminatory conduct he and his younger brother experience, on a daily basis, as students in CVSD.

46.     Despite all evidence to the contrary, CVSD has repeatedly denied that it has had any issues with bullying, discrimination, and intolerance toward members of a protected class.

47.     Further, CVSD has a long history of turning a blind eye or giving preferential treatment to its male athletes while complaints, such as those raised on behalf of Ms. Davis as per below, have been met with indifference or openly hostile behavior and retaliation.

48.     One such instance that Plaintiff uncovered recently before filing this Complaint deals with a star CVSD football, track, and wrestling athlete[3] who during the 2015 school year attacked a fellow football teammate and hit him with his helmet.

49.     Instead of being punished, the attacking student was allowed to stay on the team while the victim of the attack had to have multiple surgeries and never played football again.

50.     In 2018, that same student went up to an African American student and called the African American student a "Ni**er", but due to his abilities on in the boys' athletic programs was only placed suspension for his behavior even though two individuals who were school board

---

[3] Due to privacy concerns, the names of these students are not being stated herein, are believed to be known to Defendants by the fact pattern and will be provided to this Court under a sealed filing if so requested.

members at the time recommended that the student be banned from any participation in sports due to his history of bad behavior and indiscretion.

51. Plaintiff believes, through various and numerous circumstances, that such preferential treatment to male athletes occurred during the course of these events and is ongoing to this day and therefore avers the same.

### *CVSD CHEERLEADING*

52. Cheerleading and competitive cheerleading[4] is not just big at high schools, it is big business with expensive youth programs and private gyms popping up throughout the country.

53. Competitive cheerleading is a Pennsylvania Interscholastic Athletic Association, Inc. (the "PIAA") sanctioned sport.

54. CVSD was one of the first central Pennsylvania school districts to establish a competitive cheerleading program which is conducted under the auspices of the PIAA.

55. The competitive cheerleading program has won six different Pennsylvania state championships and were the Pennsylvania state champions for 2023-2024 year.

56. Defendants have a very skewed and discriminatory opinion of what the make-up of a championship caliber cheerleading team should be, and they adhere to the adage, "winning isn't everything, it's the only thing."

57. This is because winning ensures that substantial money keeps flowing to the pockets of those associated with it.

58. In that vein, Mrs. Shaffner and Ms. Mullen will give the appearance of allowing individuals of all color, size, shape, and abilities the opportunity to make the team while at the

---

[4] The PIAA identifies "competitive cheerleading" as "competitive spirit," however, for the purposes of this Complaint the terms are one and the same.

same time working to ensure that anyone who is not what they perceive to be the ideal shape, size, skin color, or ability to be pushed out.

59. This includes the refusal to make any necessary and reasonable accommodation to their cheerleading program as required by law.

60. CVSD Policy Manual Section 122 identifies "noncompetitive cheerleading" as an extracurricular athletic activity, which is specifically exempted from the definition of "interscholastic athletics."

61. Per both CVSD policy and 22 Pa. Code § 12.1, as an extracurricular activity, noncompetitive cheerleading is to be equally available to all students who voluntarily elect to participate.

62. Further, as an extracurricular activity, non-competitive cheerleading is to:

    a. Assess the needs and interests of and is responsive to CVDS students;

    b. Involve students in developing and planning of non-competitive cheerleading activities;

    c. Ensure competent guidance and supervision of staff;

    d. Guard against the exploitation of students;

    e. Provide for the continuing evaluation of the program and its components; and

    f. Ensure that it is open to all students and that all students are fully informed of the opportunities available to them.

63. Interscholastic sports differ from extracurricular athletic activities in that interscholastic sports need not be open to everyone but must "offer opportunities for participation…to male and female students on an as equal a basis as practicable and without discrimination, in accordance with law and regulations."

64. As such, the CVSD competitive cheerleading team can hold tryouts and deny participation based on skill, however skill plays far less of a factor over who gets to actively compete in their interscholastic competitions than does race, creed, national origin, and ability/disability.

65. The Mechanicsburg area, where CVSD is located, is home to several cheer gyms, however, if any child has dreams of being a CVSD cheerleader, they have to go through Mrs. Shaffner.

66. Just as Mr. Shaffner controls the Board, and therefore CVSD, Mrs. Shaffner maintains a stranglehold on the area's cheerleading, particularly as relates to CVSD.

67. By using his control over the Board, Mr. Shaffner has for decades ensured Mrs. Shaffner's position as CVSD's head cheer coach and together, they have hijacked CVSD's competitive and noncompetitive cheerleading programs and CVSD facilities to increase their status in the community, for their family's financial gain, and other benefits.

68. The stranglehold over the area's cheerleading program starts with Cumberland Valley Youth Cheer Association ("CVYCA"), which is directly managed and controlled by Mrs. Shaffner.

69. For a fee, CVYCA offers cheerleading instruction and participation, to CVSD resident children who are younger than 6 and through the age of 12.

70. It is well known that if you want to have a chance at becoming a CVHS cheerleader, you need to start with CVYCA and endear yourself to the coaches through enrolling in their classes and paying for attendance at cheer camps held by the CVYCA.

71. CVSD cheerleading is not an extracurricular athletic activity that is open to everyone, because there is no money for the coaches in cheering or the other athletic teams from the sidelines.

72. During Ms. Davis' time on the CVSD cheer team, Mrs. Davis, as with the other cheerleaders' parent(s), was required to enter into a contractual relationship with an organization called CV Eagles Cheerleading Boosters ("Boosters") to which they paid substantial, non-refundable fees.

73. Being associated with Boosters was mandatory for participation in the CVSD cheer program.

74. Boosters, at all relevant times, advertised, promoted, and represented that

"CV Cheer is more than just a program; it's a journey of friendships, bonding and teamwork that begins in the school's corridors and leads to the grand stages of cheerleading competitions across Pennsylvania and beyond. Along the way, we instill respect, responsibility, and character, empowering our athletes to be the best."

75. Further, Ms. Shaffner and Ms. Mullin made similar representations regarding the "CV Cheer" program and further stated that the funds collected through the nonrefundable payment, so-called "volunteer" activities, and other fundraisers (the "Funds") were all for the benefit of the cheerleading team.

76. Those representations were false, and it has recently been discovered that Boosters has a history of underreporting the funds it collects, including a recent discovery that during a fourteen-month period, Boosters fraudulently underreported the receipt and payment of well over $200,000.00.

77. CVSD only has its competitive cheerleading team, which also covers the gameday duties that are generally expected from a noncompetitive cheerleading team and the entire operation is set up for sizeable funds to be generated for Ms. Shaffner and Ms. Mullin.

78. In putting together their competitive cheerleading team at CVSD, the Coaches participate in, condone, and/or intentionally, willfully, and/or negligently ignore actions that create

a brutal climate of discrimination, intolerance, hazing, harassment, and bullying of anyone that is "different", including members of a protected class or those with a statutorily defined disability.

79.     Such a hostile environment ensures that the team put on the competition floor by the Coaches meets an unnecessarily rigid structure of height and body type, without modification even for the purposes of safety, regardless of the actual skill of the athletes.

80.     In fact, CVSD cheerleading offers a "masterclass" in psychological and emotional manipulation as the Coaches often manipulate those cheerleaders, and even their parents, in their "inner circle" to bully and mistreat certain teammates because the Coaches disfavor those cheerleaders and/or their parents.

81.     As per the below averments, once such bullying and harassing behavior is set in motion by the Coaches, it can take on a "life of its own," and continue even after a "disfavored" teammate is forced out and quits.

## KAESIE DAVIS'S CUMBERLAND VALLEY CHEER EXPERIENCE[5]

82.     Mrs. Davis began cheering with the former version of CVYCA, which was also run by Mrs. Shaffner, in August of 1992 when she was approximately seven years old.

83.     Even at that young age the participants in Mrs. Shaffner's cheer program were placed under near unbearable stress, scrutiny, and mistreatment with children publicly shamed in front of their teammates for mistakes that could cause, or did cause, score deductions in competitions.

84.     Being talented, Mrs. Davis was insulated from much of the harsh treatment her peers were subjected to and therefore she did not fully understand the degree or significance of the

---

[5] Mrs. Davis is not asserting a claim regarding her experiences as a cheerleader as any statute of limitations would have long since lapsed. Her experiences are being provided to demonstrate that for decades the Shaffners/Coaches have been mistreating children, using taxpayer funded public facilities, and exploiting minors for their own monetary gain.

improper treatment many of her teammates were receiving until she was the parent of a cheerleader herself.

85. In May of 2000, Mrs. Davis joined the junior varsity cheer squad prior to going into her ninth-grade year, and in May of 2001, Mrs. Davis made the CVSD cheer team for her sophomore year.

86. During the fall of 2001, Mrs. Davis and the other CVSD cheerleaders were required to attend various fundraising events.

87. Some of these events were held at an underage club in Harrisburg, Pennsylvania where Mrs. Davis and the other CVSD cheerleaders were encouraged to wear short and revealing clothing in order to help sell tickets to the event, essentially sexualizing underage girls for the Shaffners' monetary gain.

88. Though Mrs. Shaffner required mandatory attendance at these fundraising "dances," Mrs. Davis and the other CVHS cheerleaders were required to purchase their own tickets to those events.

89. Those "dances" were loosely supervised, and it was no secret that alcohol could be, and was, regularly taken into the venue and consumed by the minors in attendance.

90. In fact, these events were well attended by teens in the area because of the lack of supervision and the lack of restrictions on sexually suggestive dancing and the sexualization of the CVSD cheerleaders in attendance.

91. The adults supervising these events were also suspect because they were not subjected to background checks, and some of them could often be seen leering at the underage girls in their revealing attire.

92. One of the adults at the "dances" is currently on the Pennsylvania sex offender registry and at the time he was supervising the "dances" he had a criminal record related to

inappropriate conduct with young girls that could have been easily searched and discovered had anyone bothered to do so.

93. Though it was clear that the welfare of the minors who attended these dances was compromised, the profitability of the "dances" meant that they continued unabated for quite some time.

94. Mrs. Davis continued with the CVHS cheerleading team throughout high school and during that time:

a. Was required to take tumbling classes in addition to the rigorous practice schedule established by Mrs. Shaffner, which caused a financial burden on Mrs. Davis's parents;

b. Was required to pay travel costs and associated expenses for cheer competitions even through significant money was raised through fundraising activities such as the aforementioned "dances;"

c. Regularly witnessed the prevalence of bulimia amongst the cheerleaders due to the strain Mrs. Shaffner placed upon the girls in her care to maintain a certain weight and body type. In fact, Mrs. Davis witnessed girls intentionally vomiting during practice on an almost daily basis;

d. Witnessed parents who approached Mrs. Shaffner with concerns over the safety, health, and well-being of their children reduced to tears by the public humiliation caused by Mrs. Shaffner's contentious attitude and callous demeanor towards their worries; and

e. Witnessed Mrs. Shaffner fostering an environment where her daughter, Ms. Mullen, who was then on the CVHS Cheerleading team, would bully and cause psychological distress to any team member Mrs. Shaffner disapproved of.

95. Though Mrs. Davis earned countless individual medals and trophies for her talent, hard work, and dedication, she was consistently pushed out of view at events and competitions because she was smaller than the other girls and Mrs. Shaffner's belief that Mrs. Davis's shorter stature would be detrimental to the team's chances of winning.

96. Mrs. Davis found herself wanting to leave the CVHS cheer team, but her mother would not allow it, instead requiring that Mrs. Davis honor her commitment to the team and continue through her graduation.

97. While Mrs. Davis has some cherished memories from her cheer experience, her time with the CVSD cheer team, coached by Mrs. Shaffner, left her with emotional scars from the experience that, looking back now, should never have happened.

## DEKAEDA DAVIS'S CUMBERLAND VALLEY CHEER EXPERIENCE

98. Inspired by and wanting to emulate her mother and aunts who also cheered, Ms. Davis signed up for the CVYCA cheerleading program in August of 2013 when she was in first grade.

99. Though Mrs. Shaffner was still in charge of the CVYCA program, Mrs. Davis suppressed the hesitation she had from her own experiences, because she hoped that the longevity of the program meant that it had change for the better.

100. Ms. Davis, like her mother, is extremely talented and that talent initially insulated Ms. Davis from much of the negative interactions other parents and children had in CVYCA program.

101. In December of 2015, Ms. Davis was diagnosed with significant unilateral hearing loss.

102. Due to having significant unilateral hearing loss, Ms. Davis's ENT specialist identified very specific accommodations that needed to be made during cheerleading activities.

103. Those accommodations were required for the safety of Ms. Davis and the other cheer participants.

104. Those accommodations included the necessity that Ms. Davis be positioned in the middle of the mat rather than at the front, back, or sides which ensured she had a clear view of her teammates.

105. Because of her disability, Ms. Davis was required to exert considerably more effort than her teammates who did not have similar disabilities, and though the challenges she faced from her hearing impairment were and are significant, Ms. Davis is exceptionally determined and excels at her assigned tasks so long as the required accommodations are met.

106. Mrs. Davis made it a point to annually communicate to Ms. Davis's cheer coaches, including Mrs. Shaffner, Ms. Davis's disability and the accommodations she required.[6]

107. As such, Ms. Davis's coaches were, at all pertinent times hereto, aware of Ms. Davis's disability and the reasonable accommodations required for Ms. Davis's safe participation in any cheer program.

108. When Ms. Davis was in middle school in the 2020 school year she made the Junior Varsity cheer team, meaning that she would practice and attend the same competitions as the CVHS cheerleaders.

109. During the preceding summer and the 2020 cheer season, Ms. Davis and others were often held after practice, sometimes for over an hour, for additional practice sessions while Mrs. Davis and the other parents were prevented from going in and checking on their children.

---

[6] Shortly after Ms. Davis's diagnosis, Mrs. Davis approached her then primary cheer coach, Nichole Siebert and explained Ms. Davis' disability and the accommodations that would be required. Ms. Siebert expressed the callousness that is rampant within the Cumberland Valley cheerleading program by simply stating "I thought she might not be able to hear; she always yells the cheer so loudly," as she was solely concerned with how the volume of Ms. Davis's cheers would impact any competition score, and showed no compassion for a child who just found out that they had a disability that would make daily life a challenge. Par for the course for any Cumberland Valley cheer program associated with CVSD or Boosters, Ms. Seibert then began to immediately suggest that cheering might not be in Ms. Davis's best interests given how mean-spirited other people could be toward someone with Ms. Davis's disability.

110. This extra practice was required for children having difficulty with a particular skill even though they, including Ms. Davis, were already fatigued from the originally scheduled practice.

111. As a result, these unscheduled additional practices imposed:

    a. An increased risk of injury;

    b. Decreased performance; and

    c. An impaired ability to learn the skills with which they were having difficulty.

112. Ms. Davis was the shortest and smallest member of the team who the Coaches assigned to the second-to-last row, to obscure her short stature.

113. In the second to last row Ms. Davis was positioned behind teammates who significantly, if not entirely, obstructed Ms. Davis's view of her teammates and observers/attendees' view of Ms. Davis.

114. Ms. Davis's assigned position on the mat was in direct violation of the accommodations identified by her ENT specialist that were necessary for Ms. Davis to safely participate in the any cheer program.

115. At no time since her diagnosis had the accommodations Ms. Davis required been denied or ignored until she became a member of the Junior High team, and the fact that the accommodations were consistently met in prior years demonstrated just how reasonable they were.

116. At all times, Ms. Davis's coaches were aware of Ms. Davis's disability and the accommodations needed for both Ms. Davis's safety and the safety of her teammates.

117. During extensive discussions with Mrs. Shaffner and Ms. Mullen, Mrs. Davis advocated for the accommodations Ms. Davis needed to safely participate in the CVSD cheer program.

118. Instead of agreeing to make reasonable accommodations for Ms. Davis, Mrs. Shaffner and Ms. Mullen instead suggested that Mrs. Davis and Ms. Davis might find greater satisfaction cheering elsewhere.

119. Upon reaching a dead end with the Coaches, Mrs. Davis approached Mr Craig about the Coaches' refusal to provide reasonable accommodations for Ms. Davis's safety.

120. Mr. Craig assured Mrs. Davis that he would look into the matter.

121. When Mrs. Davis followed up with Mr. Craig, he told her that there was nothing for him to address relative to Mrs. Davis's complaint that no accommodations were being provided to Ms. Davis.

122. Ms. Davis is incredibly talented and had she been a male athlete of such athletic caliber, CVSD and the other Defendants would have moved mountains to accommodate Ms. Davis with such efforts as, in the example cited above, were used to cover up and protect a star male athlete from his abhorrent conduct and indiscretions.

123. Instead, Ms. Davis was retaliated against was held back by the Coaches from participating in competitions as retaliation for requesting reasonable accommodations for her disability.

124. In February 2020, in one of the limited competitions the coaches allowed Ms. Davis to participate in, Ms. Davis missed a stunt due not having a clear line of sight as required for her disability.

125. After the performance, Mrs. Davis encountered three of Ms. Davis's teammates watching a video of Ms. Davis's stunt mishap and brutally mocking her and laughing at her.

126. Watching her daughter reduced to tears by her teammates, Mrs. Davis suggested to them that encouragement might lead to a more favorable outcome than viciously mocking a mishap that occurred as a result of not providing accommodations for Ms. Davis's disability.

127. It was then that in an episode of misplaced anger and with an almost religious fervor for the toxic environment within CVSD's cheer program, that a parent on the cheer team, threatened Mrs. Davis with physical harm.

128. Upon reporting the incident to the Coaches, the Coaches were more concerned with the fact that Mrs. Davis took Ms. Davis home in Mrs. Davis's car, instead of Ms. Davis riding the bus with the rest of the team.

129. Upon realizing the Coaches would in no way entertain or implement the reasonable accommodation for Ms. Davis's disability and realizing the continued risk of harassment and violence from cheer parents believed to be effectuated by the Coached for requesting accommodation for Ms. Davis, Mrs. Davis removed Ms. Davis from all aspects of the CVSD cheer program.

130. While Ms. Davis's talents made it impossible for the Coaches to completely exclude her from the CVSD cheerleading team, it is believed that those same Coaches encouraged and manipulated Ms. Davis's teammates, and even some of their parents, to be to become hostile toward her, attempting to bully and harass Ms. Davis into quitting the team as retaliation for requesting reasonable accommodations for her disability.[7]

131. Thus, the bullying and harassment Ms. Davis received from her teammates was directly related to her disability and the Defendants condoned such behavior or were aware of the same and did nothing.

132. Had Ms. Davis been a male athlete, as stated above and supported by a specific example, her treatment would have been entirely different in these circumstances.

---

[7] Mrs. Shaffner has a history of having "favorites" on her cheer teams, who she would manipulate into sharing her opinions of the members of the cheer team she disapproved of. This would lead to bullying and toxic behavior by Mrs. Shaffner's "favorites," which at one time included Ms. Mullen, in an attempt to get those she disapproved of to quit.

133. The hostility toward Ms. Davis did not stop when she left the team as, in her ninth-grade year, upon returning to school she was brutally bullied, mocked, and harassed by her former teammates.

134. Ms. Davis would often come home from school in tears, and became so emotionally despondent from the conduct of her former teammates and fellow students that she resorted to self-harm through behavior known as "cutting," as a way to cope with the extreme emotional pain, sadness, anger and stress her former teammates were causing.

135. As a result of the constant bullying and harrassment, Ms. Davis eventually had no choice but to attend CVSD via virtual instruction.

136. As a sole, direct, proximate, factual, and legal result of the Defendants' individual and collective conduct as aforesaid, including the discrimination, harassment, and bullying she endured, Ms. Davis has suffered and will continue to suffer, the following severe, serious, and potentially permanent injuries, many of which have adverse physical manifestations:

      a. Anxiety;

      b. Anger;

      c. Fear;

      d. Depression;

      e. Headaches;

      f. Trouble Sleeping;

      g. PTSD;

      h. Low self-esteem;

      i. Fear of retaliation;

      j. Physical scarring;

k. Feeling disconnected from others in the community solely on the basis of her disability; and

l. Other severe, serious, and potentially permanent injuries as will be developed in discovery and proven at trial.

137. As a sole, direct, proximate, factual, and legal result of the hostile environment within CVSD, and the discrimination, harassment, and bullying she experienced as a member of a protected class, Ms. Davis has been denied that same benefits and opportunities her male counterparts received.

138. As a sole, direct, proximate, factual, and legal result of the Defendants' individual and collective conduct as aforesaid, including the discrimination, harassment, and bullying she experienced, Ms. Davis has suffered, and will continue to suffer, the following severe, serious, and potentially permanent damages, losses, and harm:

a. She has suffered and will continue to suffer severe physical pain, anxiety, depression, embarrassment, humiliation, emotional distress, mental anguish, inconvenience, and a loss of life's pleasures;

b. She has been and/or will continue to be obliged to receive and undergo medical attention, care, and treatment, and has spent and will continue to spend significant sums of money to restore her health;

c. Her ability to perform her activities of daily living has been severely impaired;

d. Her general health, strength, and vitality have been greatly impaired, thereby depriving her of the normal joys of life; and

e. Other severe, serious, and potentially permanent damages, losses, and harm as will be developed in discovery and proven at trial.

# FEDERAL CLAIMS

## COUNT I

**PLAINTIFF VS. CUMBERLAND VALLEY SCHOOL DISTRICT**

**VIOLATION OF TITLE II OF**
**THE AMERICANS WITH DISABILITIES ACT (42 U.S.C. § 12132)**

139. Plaintiff incorporates herein by reference as though fully set forth at length the averments set forth in paragraphs 1 through 138 above.

140. Title II of the Americans with Disabilities Act (the "ADA") states that "[n]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

141. Ms. Davis's substantial unilateral hearing loss is a qualifying disability under the ADA.

142. CVSD is a public entity as defined by the ADA.

143. Through virtual instruction, Ms. Davis has received a Free Appropriate Public Education ("FAPE").

144. As participation in sports are not a core part of a FAPE, Plaintiff is not required to exhaust any administrative remedies in order to bring this Count I.

145. At all times pertinent hereto, CVSD had a statutory duty to ensure that its cheerleading team was accessible to individuals with disabilities through reasonable accommodations.

146. CVSD, by and through decades of collective incidents of discrimination, harassment, and bullying toward anyone who is a member of a protective class has created a hostile, pro-bullying, and intolerant environment which is systemic throughout the Board, CVSD's

educators, CVSD's administration and personnel, CVSD's coaches, CVSD's students, and many of CVSD's parents and alumni.

147. That environment at CVSD led the Coaches and Ms. Davis's teammates to believe that they could harass and bully Ms. Davis, and force her off the team, because of her disability.

148. That environment at CVSD led the Coaches to believe they could deny Ms. Davis reasonable accommodations and not face any ramification or discipline for such discriminatory conduct.

149. Mr. Shaffner, in his position with the Board, had an affirmative duty to prevent such a hostile, discriminatory environment from occurring within CVSD, and yet he failed to do so because of the willful blind eye he turned for his personal monetary gain, and because he himself practices and believes in bigotry and intolerance.

150. Mr. Rausch, as president of the Board, had an affirmative duty to prevent such a hostile, discriminatory environment from occurring within CVSD, and yet he failed to do so because he is essentially a puppet of Mr. Shaffner, and because he himself practices and believes in bigotry and intolerance.

151. Mr. Craig, in his position with CVSD, had an affirmative duty to investigate, prevent or stop, discriminatory conduct and to ensure that the athletic programs under his purview did not discriminate against individuals with disabilities and to ensure that reasonable accommodations for made so athletes with disabilities could participate.

152. In accordance with the aforesaid facts, Mr. Craig failed in those duties.

153. Under statutory authority of the ADA, the circumstances, and under principles of respondeat superior and ostensible agency, CVSD is vicariously liable to Ms. Davis.

154. The actions and omissions of CVSD, individually and by and through the above identified individuals, were knowing, intentional, willful, malicious, and reckless, they were made

with a wanton disregard and/or with deliberate indifference for Ms. Davis's rights under federal law which have caused Ms. Davis to suffer the aforesaid severe, serious, and potentially permanent injuries, damages, losses, and harm and they warrant the imposition of compensatory damages in favor of Ms. Davis and against CVSD in such forms as are recoverable under the law.

WHEREFORE, Plaintiff, Dekaeda Davis demands judgment in her favor and against Defendant, Cumberland Valley School District, in an amount in excess of $75,000, together with reasonable attorneys' fees and such other relief as this Court deems appropriate.

## COUNT II

### PLAINTIFF VS. CUMBERLAND VALLEY SCHOOL DISTRICT

### VIOLATION OF SECTION 504 OF THE REHABILITATION ACT (29 U.S.C § 794)

155. Plaintiff incorporates herein by reference as though fully set forth at length the averments set forth in paragraphs 1 through 154 above.

156. Section 504 if the Rehabilitation Act (the "Act") states that "[n]o otherwise qualified individual with a disability in the United States…shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

157. Ms. Davis's substantial unilateral hearing loss is a qualifying disability under the Act.

158. At all times pertinent hereto. CVSD received Federal financial assistance and, as such, is covered under the Act.

159. Through virtual instruction, Ms. Davis has received a Free Appropriate Public Education ("FAPE").

160. As participation in sports is not a core part of a FAPE, Plaintiff is not required to exhaust any administrative remedies in order to bring this Count II.

161. At all times pertinent hereto, CVSD had a statutory duty to ensure that its cheerleading team was accessible to participation by individuals with disabilities through reasonable accommodations.

162. CVSD, by and through decades of collective incidents of discrimination, harassment, and bullying toward anyone who is disabled and/or a member of a protective class has created a hostile, pro-bullying, and intolerant environment which is systemic throughout the Board, CVSD's educators, CVSD's administration and personnel, CVSD's coaches, CVSD's students, and many of CVSD's parents and alumni.

163. That environment at CVSD led the Coaches and Ms. Davis's teammates to believe that they could harass and bully Ms. Davis, and force her off the team, because of her disability.

164. That environment at CVSD led the Coaches to believe they could deny Ms. Davis reasonable accommodations and not face any ramification or discipline for such discriminatory conduct.

165. Mr. Shaffner, in his position with the Board, had an affirmative duty to prevent such a hostile, discriminatory environment from occurring within CVSD, and yet he failed to do so because of the willful blind eye he turned for his personal monetary gain, and because he himself practices and believes in bigotry and intolerance.

166. Mr. Rausch, as president of the Board, had an affirmative duty to prevent such a hostile, discriminatory environment from occurring within CVSD, and yet he failed to do so because he is essentially a puppet of Mr. Shaffner, and because he himself practices and believes in bigotry and intolerance.

167. Mr. Craig, in his position with CVSD, had an affirmative duty to investigate, prevent or stop, discriminatory conduct and to ensure that the athletic programs under his purview did not discriminate against individuals with disabilities and to ensure that reasonable accommodations for made so athletes with disabilities could participate.

168. In accordance with the aforesaid facts, Mr. Craig failed in those duties.

169. Under statutory authority of the Act, the circumstances, and under principles of respondeat superior and ostensible agency, CVSD is vicariously liable to Ms. Davis.

170. The actions and omissions of CVSD, individually and by and through the above identified individuals, were knowing, intentional, willful, malicious, and reckless, they were made with a wanton disregard and/or with deliberate indifference for Ms. Davis's rights under federal law which have caused Ms. Davis to suffer the aforesaid severe, serious, and potentially permanent injuries, damages, losses, and harm and they warrant the compensatory damages in favor of Ms. Davis and against CVSD in such forms as are recoverable under the law.

WHEREFORE, Plaintiff, Dekaeda Davis demands judgment in her favor and against Defendant, Cumberland Valley School District, in an amount in excess of $75,000, together with reasonable attorneys' fees and such other relief as this Court deems appropriate.

## COUNT III

**PLAINTIFF VS. CUMBERLAND VALLEY SCHOOL DISTRICT, HAROLD "BUD" SHAFFNER, GREGORY RAUSCH, KRISTI SHAFFNER, BETHANY MULLIN, AND MICHAEL CRAIG**

**42 U.S.C. §1983/VIOLATION OF THE EQUAL
PROTECTION CLAUSE OF THE 14TH AMENDMENT**

171. Plaintiff incorporates herein by reference as though fully set forth at length the averments set forth in paragraphs 1 through 170 above.

172. The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o state shall…deny to any person within its jurisdiction the equal protection of the laws." U.S. Const., amend. XIV, § 1.

173. Defendant CVSD, as a public educational institution, is subject to the Equal Protection Clause of the Fourteenth Amendment.

174. Ms. Davis is a member of a protected class based on her sex.

175. At all times Defendants were responsible for the administration and operation of CVSD and/or its various athletic program, or portions thereof.

176. For the reasons set forth above, the actions of the Defendants in this Count were made under color of law.

177. Defendants individually and collectively discriminated against Ms. Davis on the basis of her sex by providing preferential treatment to male athletes, which included covering up bad behavior while Ms. Davis' request for reasonable accommodations led to retaliations and severe bullying and hostile treatment.

178. The Defendants, in participating in, condoning, or being deliberately indifferent to the discriminatory hostile environment within CVSD and the discrimination experienced by Ms. Davis due to her sex were, at all times, acting both in their individual capacities and color of law.

179. By being subjected to the hostile, discriminatory environment that is rampant within CVSD as well as the discrimination, harassment, and bullying she has personally experienced as a result of her the disparate treatment she endured compares to similarly situated male athletes, Mr. Davis has been:

    a. Denied an equal opportunity to access resources and opportunities through CVSD as that of similarly situated male students;

b.      Subjected to an intimidating, hostile, discriminatory, and offensive environment as retaliation for requesting accommodations that male athletes readily would receive;

c.      Prevented from participation in and enjoyment of CVSD activities.

180.    These Defendants' aforesaid actions and omissions were knowing, intentional, willful, malicious, and reckless, they were made with a wanton disregard for Ms. Davis's rights under federal law which have caused Ms. Davis to suffer the aforesaid severe, serious, and potentially permanent injuries, damages, losses, and harm and warrant the imposition of sanctions in favor of Ms. Davis and against these Defendants.

181.    Under the circumstances and under principles of respondeat superior and ostensible agency, CVSD is vicariously liable to Ms. Davis for the actions of the other Defendants that were made under color of law.

WHEREFORE, Plaintiff, Dekaeda Davis demands judgment in her favor and against Defendants, Cumberland Valley School District, Gregory Rausch, Harold "Bud" Shaffner, Kristi Shaffner, Bethany Mullin, and Michael Craig, in an amount in excess of $75,000, together with punitive damages, including attorneys' fees and expenses, pursuant to 42 U.S.C. § 1988, and such other relief as this Court deems appropriate.

**COUNT IV**

**PLAINTIFF VS. CUMBERLAND VALLEY SCHOOL DISTRICT**

**VIOLATION OF TITLE IX OF**
**THE EDUCATION AMENDMENTS OF 1972 (20 U.S.C. §1681**

182.    Plaintiff incorporates herein by reference as though fully set forth at length the averments set forth in paragraphs 1 through 181 above.

183. Title IX of the Education Amendments of 1972, 10 U.S.C. §1681, *et seq.*, prohibits discrimination on the basis of sex in any education program or activity receiving federal funding.

184. At all relevant times hereto, Ms. Davis was a female student enrolled at CVSD as was otherwise qualified to participate in CVSD's athletic programs and extracurricular activities.

185. CVSD was properly notified and made aware of Ms. Davis' hearing disability and requested reasonable accommodations to enable her full and equal participation in the school's athletic programs.

186. CVSD refused such reasonable accommodations to Ms. Davis while providing preferential treatment to male athletes including covering up bad behavior of its star male athletes.

187. CVSD has a long-running pattern and practice of providing preferential treatment to its male athletes.

188. CVSD's actions and omissions resulted in Ms. Davis being treated less favorably than similarly situated male athletes.

189. The actions and omissions of CVSD, individually and by and through the above identified individuals, were knowing, intentional, willful, malicious, and reckless, they were made with a wanton disregard and/or with deliberate indifference for Ms. Davis's rights under federal law which have caused Ms. Davis to suffer the aforesaid severe, serious, and potentially permanent injuries, damages, losses, and harm and they warrant the compensatory damages in favor of Ms. Davis and against CVSD in such forms as are recoverable under the law.

WHEREFORE, Plaintiff, Dekaeda Davis demands judgment in her favor and against Defendant, Cumberland Valley School District, in an amount in excess of $75,000, together with reasonable attorneys' fees and such other relief as this Court deems appropriate.

33

**STATE COURT CLAIMS**

**COUNT V**

**PLAINTIFF VS. CUMBERLAND VALLEY SCHOOL DISTRICT, HAROLD "BUD" SHAFFNER, GREGORY RAUSCH, KRISTI SHAFFNER, BETHANY MULLIN, AND MICHAEL CRAIG**

**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

190. Plaintiff incorporates herein by reference as though fully set forth at length the averments set forth in paragraphs 1 through 189 above.

191. By and through their actions, omissions, and indifference as aforesaid, each of these Defendants has acted in an extreme and outrageous manner.

192. As a result of these Defendants' individual and collective actions, omissions, and indifference as aforesaid, which were extreme and outrageous, Ms. Davis suffered, and continues to suffer, severe emotional distress.

193. These Defendants' individual and collective actions, omissions, and indifference were under the color of law and/or were knowing, intentional, willful, malicious, and reckless and/or were with a wanton disregard for Ms. Davis's rights under federal law and have caused Ms. Davis to suffer, and continue to suffer, the aforesaid severe, serious, and potentially permanent injuries, damages, losses, and harm and warrant the imposition of sanctions in favor of Ms. Davis against these Defendants.

194. Under the circumstances and under principles of respondeat superior and ostensible agency, CVSD is vicariously liable to Ms. Davis for the actions of each of these individual Defendants that were made under color of law.

WHEREFORE, Plaintiff, Dekaeda Davis demands judgment in her favor and against Defendants, Cumberland Valley School District, Gregory Rausch, Harold "Bud" Shaffner, Kristi

34

Shaffner, Bethany Mullin, and Michael Craig in an amount in excess of $75,000, together with punitive damages, including attorneys' fees and expenses, and such other relief as this Court deems appropriate.

**COUNT VI**

**PLAINTIFF VS. CUMBERLAND VALLEY SCHOOL DISTRICT, HAROLD "BUD" SHAFFNER, GREGORY RAUSCH, KRISTI SHAFFNER, BETHANY MULLIN, AND MICHAEL CRAIG**

**<u>NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS</u>**

195.    Plaintiff incorporates herein by reference as though fully set forth at length the averments set forth in paragraphs 1 through 194 above.

196.    Each of these Defendants owed a duty to abstain, or to implement measures to prevent, the discrimination and bullying levied upon Ms. Davis as a result of her disability.

197.    Instead, these Defendants actively took part in, supported, aided, abetted, condoned, or were otherwise indifferent to the discrimination, harassment, and bullying Ms. Davis suffered and which these Defendants knew, or should have known, was occurring.

198.    As a result of the individual and collective actions, omissions, and indifference of these Defendants as aforesaid, which were extreme and outrageous, Ms. Davis suffered, and continues to suffer, severe emotional distress.

199.    The individual and collective actions, omissions, and indifference of these Defendants, as aforesaid, were under the color of law and/or were knowing, intentional, willful, malicious, and reckless and/or were with a wanton disregard for Ms. Davis's rights under federal law and have caused Ms. Davis to suffer the aforesaid severe, serious, and potentially permanent injuries, damages, losses, and harm and warrant the imposition of sanctions in favor of Ms. Davis and against Defendants.

200. Under the circumstances and under principles of respondeat superior and ostensible agency, CVSD is vicariously liable to Ms. Davis for the actions and omissions of the individual Defendants.

WHEREFORE, Plaintiff, Dekaeda Davis demands judgment in her favor and against Defendants, Cumberland Valley School District, Gregory Rausch, Harold "Bud" Shaffner, Kristi Shaffner, Bethany Mullin, and Michael Craig in an amount in excess of $75,000, together with punitive damages, including attorneys' fees and expenses, and such other relief as this Court deems appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial.

Respectfully submitted,

**THE FARNETH LAW GROUP, LLC**

September 26, 2025

By: /s/ George R. Farneth II
George R. Farneth II, Esquire
445 Fort Pitt Blvd., Suite 160
Pittsburgh, PA 15219
Tel: (412) 863-7092
Fax: (412) 586-4713
Email: grf@farnethlaw.com
PA ID #53914
WV ID #10749

**BRENLOVE & FULLER, LLC**

By: Nicholas A. Miller
Nicholas A. Miller, Esq.
401 Washington Avenue
Bridgeville, PA 15017

412-221-0640 x 112
nmiller@brenlovefuller.com

Attorneys for Plaintiffs

**CERTIFICATE OF SERVICE**

I hereby certify that on this 26th day of September 2025 a true and correct copy of the foregoing First Amended Compliant was served on all parties, electronically, via this Courts' ECF filing system.

**THE FARNETH LAW GROUP, LLC**

By: /s/ George R. Farneth II
George R. Farneth II, Esquire
445 Fort Pitt Blvd., Suite 160
Pittsburgh, PA 15219
Tel: (412) 863-7092
Fax: (412) 586-4713
Email: grf@farnethlaw.com
PA ID #53914
WV ID #10749